Walter W. CALHOUN, Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, Defendant-Appellee,

George H. Kasper, Jr., Intervenor-Appellant.

No. 86–8438.

United States Court of Appeals, Eleventh Circuit.

Aug. 3, 1987.

H.A. Stephens, Jr., Decatur, Ga., for intervenor-appellant.

Jefferson D. Kirby III, Atlanta, Ga., for defendant-appellee.

Before RONEY, Chief Judge, KRAVITCH and EDMONDSON, Circuit Judges.

RONEY, Chief Judge:

George H. Kasper, Jr., an intervenor party-plaintiff in the district court, claimed that his removal as Regional Counsel and subsequent involuntary retirement by the Federal National Mortgage Association (FNMA) violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. §§ 621–634, the Federal National Mortgage Association Charter Act (Charter Act), 12 U.S.C.A. §§ 1716–1723h, and Georgia's Prohibition of Age Discrimination in Employment statute, O.C.G.A. § 34–1–2. The district court held that neither the Charter Act nor the Georgia Act provided a private right of action, and dismissed those claims. It granted summary judgment on the ADEA claim because Kasper had not timely filed a charge with the Equal Employment Opportunity Commission (EEOC) as required by 29 U.S.C.A. § 626(d)(1), and no factors had been shown to warrant equitable tolling of the limitations period. We affirm.

Kasper accepted an appointment with the FNMA's predecessor in December, 1965, after sixteen years experience in private law practice, as a career attorney and was promoted to Assistant Agency Counsel in 1967. FNMA was reorganized in 1968 to create two separate corporations. 12 U.S.C.A. § 1717(a)(2). One corporation, Government National Mortgage Association (GNMA), remained a governmental agency, while the other corporation, a new FNMA, was created as a private corporation. Upon reorganization, Kasper became an employee of GNMA and, on November 30, 1968, resigned his position with GNMA to accept an identical position with the newly created FNMA. He was promoted to the position of Southeastern Regional Counsel in 1977 and held that position until July 1982.

On July 22, 1982, FNMA's Southeastern Regional Vice-President, Glenn T. Austin, Jr., informed Kasper that his services were no longer required, and instructed him to contact Al Burfiend, FNMA's Vice-President for Personnel and Administration in FNMA's Washington, D.C. office, to discuss severance terms. Kasper informed his staff of his departure on that afternoon and had cleaned out his office by noon of the next day.

Discussions with Burfiend established that Kasper would receive credit for 19 years of service and 6 months severance pay. An agreement was reached to allow Kasper to remain on the payroll for one year, by extending his severance pay over

that period, providing him with 20 years service for retirement purposes. Kasper alleges that during their discussions he asked Burfiend to look into a transfer or reassignment. At no time after July 23, 1982 did Kasper return to the office to work or receive assignments from FNMA. FNMA advertised the availability of Kasper's former position on July 28, 1982. In August, 1982, Kasper received a memorandum from Burfiend specifying that Kasper would "be continued in FNMA employment from August 8, 1982 through August 5, 1983, at which time he [would] retire under the discontinued service provisions of the Civil Service Retirement System (immediate entitlement)." Kasper was to receive his full salary until August 7, 1982, when his income would begin to be reduced on a quarterly basis until his retirement on August 5, 1983. He was to continue receiving fringe benefits except for leave based on full salary rate, and he was to receive accrued vacation pay with his final salary check upon his retirement in 1983. Except for minor adjustments requested by Kasper, he was paid in accordance with the terms of the memorandum.

In late 1982, Kasper met his replacement, Judy Dedmon, who was 31 years old at the time. As a result of attending an American Bar Association seminar concerning age discrimination on March 11, 1983, Kasper decided that he had been dismissed because of his age. Kasper wrote Oakley Hunter, a former president of FNMA and a member of the FNMA Board of Directors, and asked if Hunter could look into his situation. The gist of the letter appeared to focus on whether a better severance package could be arranged. In Kasper's letter to Hunter, he charged that he had never been given an explanation for his involuntary discharge and questioned its cause and justification. In a June 1983 letter to David Maxwell, chairman of the Board of Directors of FNMA, Kasper accused FNMA of corporate wrongdoing and claimed to have statistical evidence of discrimination. Kasper was contacted by Caryl Bernstein, FNMA's Executive Vice-President, General Counsel, and Secretary. Kasper's request from Bernstein was a more favorable severance agreement. By letter dated August 5, 1983, Bernstein declined to agree to different severance terms and reaffirmed FNMA's intention to adhere to the August 1982 proposal. Kasper received a subsequent notice of his termination under "discontinued service retirement" effective August 5, 1983, and has received retirement benefits from that date. Kasper filed charges with the EEOC on August 24, 1983, and filed a motion to intervene in this proceeding on November 15, 1983.

## I. No Private Right of Action under the Charter Act

■ Kasper contends that under the Federal National Mortgage Association Charter Act, those individuals hired prior to 1968 and who were employees of the predecessor corporation Government National Mortgage Corporation were "government employees" and retained such status. As a Government employee, he had a "legitimate claim of entitlement to continued employment" until removed in accordance with established procedure. FNMA failed to adhere to the regulations and a right of action therefore is implied under the FNMA Charter Act in Kasper's favor.

Kasper's assertion that he is a Government employee for the purposes of this action is erroneous. To support his status as a Government employee, Kasper relies on *Northrip v. Federal National Mortgage Association*, 527 F.2d 23 (6th Cir. 1974).

In *Northrip*, the Sixth Circuit stated:

Before the reorganization of FNMA, its employees were government personnel with the Department of Housing and Urban Development, and therefore were covered by civil service requirements and retirement laws. To protect employee benefits that had accumulated, the statute provided for continuation of their participation in the system as long as they remained employees of FNMA. However, all employees hired after 1968 became employees of the corporation and are not subject to the civil service laws. 12 U.S.C. § 1723a(d)(1).

527 F.2d at 31. In dicta, the *Northrip* court stated that some FNMA employees had some sort of government status. *Id.* at 32.

The Sixth Circuit mistakenly referred to 12 U.S.C.A. § 1723a(d)(1) as applying to FNMA, rather than GNMA; therefore, *Northrip* is not controlling in this case. The extension of the protections of civil service and classification laws found in 12 U.S.C.A. § 1723a(d)(1) relate to employees of the "Association," defined in 12 U.S.C.A. § 1717(a)(2)(A) as GNMA.

Kasper also points to two memoranda addressed to all employees of GNMA inviting and encouraging them to join the newly created FNMA in 1968 to support his Government employee status. A review of the memoranda reveals clear language that FNMA is a private corporation and that new personnel policies and benefits would be established by the corporation, which were separate and distinct from the federal civil service laws. It is also evident from the language of 12 U.S.C.A. § 1723a(d)(2), the subsection addressing appointment and compensation of personnel of the "Corporation," defined in section 1717(a)(2)(B) as FNMA, that Congress intended the status of Government employee to extend to civil service retirement laws only.

(2) The board of directors of the corporation shall have the power to select and appoint or employ such officers, attorneys, employees, and agents, to vest them with such powers and duties, and to fix and to cause the corporation to pay such compensation to them for their services, as it may determine; *and any such action shall be without regard to the Federal civil service and classification laws....* Each officer and employee of the corporation who is employed by the corporation prior to January 31, 1972, and *who on the day previous to the beginning of such employment will have been subject to the civil service retirement law* (subch. III of ch. 83 of Title 5) *shall,* so long as his employment by the corporation continues without a break in continuity of service, continue to be subject to *such* law; and for the purpose of *such* law his employment by the corporation without a break in continuity of service shall be deemed to be employment by the Government of the United States.

12 U.S.C.A. § 1723a(d)(2) (emphasis added).

Kasper further asserts that the statutory language provides an implied right of action. In essence, Kasper relies upon the language in 12 U.S.C. § 1723a(d)(2), which states, "Appointments, promotions, and separations so made shall be based on merit and efficiency, and no political tests or qualifications shall be permitted or given consideration."

The standard for determining whether a private right of action is implied in a federal statute was set forth in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), where the Court stated that the following factors were relevant:

First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted.' ... that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?.... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?.... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? (emphasis in original)

In *Local Division 732 Amalgamated Transit Union v. Metropolitan Atlanta Rapid Transit Authority,* 667 F.2d 1327 (11th Cir.1982), cited in the district court opinion, this Court noted that the Supreme Court has drastically modified application of the four-factor test announced in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), by announcing that the task of a federal court in implied cause of action cases is to determine whether Congress intended to create the private right of action being asserted. *TransAmerica Mortgage Advisers, Inc. v. Lewis,* 444 U.S. 11,

100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Reddington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

Since a review of the Charter Act and its legislative history reveals nothing to show Congress intended a private right of action under this section, the conclusion must be that Congress did not intend to create the cause of action asserted here.

## II. No Private Right of Action under O.C. G.A. § 34-1-2.

■ The district court held that no private right of action arose under O.C.G.A. § 34-1-2, a penal statute prohibiting age discrimination in employment. Penal statutes in Georgia do not give rise to a private cause of action for the conduct proscribed. The court properly relied upon *Webster v. Singer Sewing Machines Company*, N.B-76966 (Fulton Sup.Ct. May 15, 1973) (Georgia state trial court holding that no cause of action accrued under Ga.Code Ann. § 54-1102, the predecessor to O.C.G.A. § 34-1-2), and two Georgia appellate court decisions finding no cause of action under similar Georgia penal statutes, *Cox Broadcasting Corp. v. Cohn*, 231 Ga. 60, 200 S.E.2d 127 (1973), *rev'd on other grounds*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 *judgment conformed*, 234 Ga. 67, 214 S.E.2d 530 (1975), and *Mitchell v. Southern Dairies, Inc.*, 77 Ga.App. 771, 49 S.E.2d 912 (1948).

Kasper argues that the district court incorrectly interpreted Georgia precedent, relying upon *LaBarre v. Payne*, 174 Ga.App. 32, 329 S.E.2d 533 (1985), a case in which a Georgia appellate court recognized a private cause of action for embracery, conduct for which Georgia law imposes criminal sanctions. *See* O.C.G.A. § 16-10-91. Kasper's reliance on *LaBarre* is misplaced. The Georgia Court of Appeals supported its *LaBarre* holding by citing to the common law tort of embracery in other jurisdictions and *Corpus Juris Secundum*. It is evident from these references that the court relied upon a common law tort of embracery to sustain the action and simply use the Georgia penal statute to define the elements of the tort.

## III. ADEA Claim.

■ Kasper asserted two claims of discrimination: (1) termination as Regional Counsel, and (2) "involuntary retirement discontinued service." The district court held that Kasper had not filed charges with the EEOC within the 180 days required by law. The issue of timeliness turns on when the period for filing began.

*Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), a case involving a college professor denied tenure, held the limitations period commenced no later than when the college announced its official position on tenure, not when the professor's terminal contract expired. Under this authority, the district court determined that for purposes of applying the limitations period of 29 U.S.C.A. § 626(d)(1), July 22, 1982 was the date on which Kasper's cause of action for his removal as Regional Counsel accrued. On his involuntary retirement claim, the district court found that, giving plaintiff the benefit of the doubt, the latest operative date would be August 4, 1982, the date when Kasper received a letter stating that he would be retired on August 5, 1983.

Kasper argues that the operative date, at least for the unlawful termination, is August 5, 1983, the date of actual termination. He seeks to distinguish *Ricks* on the basis that his complaint alleges a continuation of discriminatory acts up until his actual termination. Kasper's complaint reveals no allegations of continuing acts of discrimination. In fact, all the acts complained of occurred in 1982. From August 1982 forward, FNMA did not deviate from its expressed intention to terminate Kasper as of August 5, 1983.

The proper focus for purposes of establishing the time at which the limitations period begins to run "is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981) (emphasis in original) (citing *Ricks*, 449

U.S. at 258, 101 S.Ct. at 504). "The fact of termination is not itself an illegal act." *Id.* The alleged illegal acts here were the decision to terminate and the notice of that decision to Kasper. It is clear from the record that Kasper received unequivocal notice on July 22 and August 4, 1982 of FNMA's intention to remove him as Regional Counsel and to terminate his employment on August 5, 1983. FNMA never waivered from this position.

Kasper alleges that the authority to terminate his employment was vested in the FNMA Board of Directors (Board) and that neither Austin nor Burfiend possessed that authority. Unlike the plaintiff in *Ricks,* Kasper claims, he was never notified of any action of the Board. Austin had the authority to terminate Kasper, however, if his conduct was deleterious to the continued functioning of the unit. It is clear that Kasper considered the notice authoritative because he cleaned out his office on July 22 and 23 and never received any further work assignments from FNMA. Kasper sought letters of recommendation from FNMA officials and met his 31-year-old replacement in the fall of 1982, and accepted other employment in May 1983 even though he was still on the FNMA payroll. At no time before his actual termination in 1983 did Kasper evidence a doubt of Austin's authority or of FNMA's intentions. Kasper's correspondence with FNMA officials focused on his obtaining severance terms more favorable than those noticed in the August 4, 1982 memorandum. At no time did Kasper formally request a transfer or reassignment. The latest possible operative date for limitations purposes would have been the point when Kasper met his replacement.

The district court found no factors to present sufficient to equitably toll the limitation period, but found two factors support the decision that Kasper's involuntary retirement claim should be time barred. First, Kasper acknowledges recognition of his right after attending a conference on age discrimination in March 1983, but did not file his charge with EEOC until almost six months later. Second, the court found that the fact that Kasper was an attorney weighed against equitable tolling.

 Kasper's final argument is that the limitations period did not begin to run because he has never been provided a hearing on his discharge by FNMA and this constitutes a continuing violation under *Rubin v. O'Koren,* 644 F.2d 1023 (5th Cir. Unit B 1981). Reliance on *Rubin* is inapposite because that case addresses a claim under 42 U.S.C.A. § 1983 for a due process violation. Kasper's claim arises under the ADEA and failure to provide a hearing does not constitute a continuing discriminatory act on these facts.

For the foregoing reasons, the judgment of the district court is due to be

AFFIRMED.