Gaylen WISDOM, Plaintiff,

v.

M.A. HANNA COMPANY and PMS Consolidated, Inc., Defendants.

Civil Action No. 1:95–CV–2492–FMH.

United States District Court, N.D. Georgia, Atlanta Division.

June 4, 1997.

**1472**

Harlan Stuart Miller, III, Kirwan, Parks, Chesin & Miller, Atlanta, GA, for Plaintiff.

Charles Edward Feuss, Mark L. Keenan, Ogletree, Deakins, Nash, Smoak & Stewart, Atlanta, GA, for Defendants.

## ORDER

HULL, District Judge.

Plaintiff Gaylen Wisdom brings this employment discrimination action under the Age Discrimination in Employment Act ("ADEA") and under state law. Plaintiff claims that Defendants' terminating him and replacing him with an employee 21 years his junior constituted age discrimination. This matter is before the Court on Defendants M.A. Hanna Company ("Hanna") and PMS Consolidated, Inc.'s ("PMS") Motions for Summary Judgment [21–1; 22–1] on all of Plaintiff's claims.

## I. FACTS

In 1979, Plaintiff began work as Manager of Management Information Systems ("MIS") for Defendant PMS. At all times relevant to this action, Defendant PMS was a wholly-owned subsidiary and then a division

of Defendant Hanna. Subsequent to Plaintiff's termination, Defendant PMS was consolidated with Defendant Hanna's Allied Color and Wilson Color divisions to form M.A. Hanna Color Division. At the time of the consolidation, Defendant PMS ceased to exist as a separate entity.

As Defendant PMS's Manager of MIS, Plaintiff was responsible for all facets of Defendant PMS's MIS function, including managing the MIS department and its employees. Plaintiff was responsible for all software and hardware utilized by Defendant PMS and its plants throughout the United States. Plaintiff's responsibilities included preserving data integrity, maintaining the availability of the computer system and its services, providing meaningful operational data and reports, as well as training the system's users and monitoring the system's performance.

The first computer system Defendant used under Plaintiff's direction was a System 38 minicomputer. In 1983, Defendant PMS switched to the IBM AS/400 minicomputer for its computer needs. Plaintiff was involved in the decision to switch to the AS/400 and was responsible for overseeing implementation of the AS/400. Defendant PMS used the MAPICS database software program with its AS/400.

### A. Defendant PMS Experiences Problems With Its MAPICS Software

#### 1. MAPICS Version 2 Software Was Not Adequate to Meet Defendant PMS's Computer Needs

In 1990, Defendant PMS upgraded its software program to MAPICS version 2. However, this program was not adequate to address Defendant PMS's business needs. Plaintiff and his staff were required to make over 1.000 programming changes to the software to make it adequate for Defendant PMS's needs. Despite all the programming changes, Plaintiff still believed in the Fall of 1993 that the MAPICS version 2 software was adequate to meet Defendant PMS's needs. Plaintiff believed that he and his staff could continue to make programming

changes as necessary to meet the company's needs.

### 2. *Implementation of MOD 4 Software Caused Numerous Problems*

In 1993, users of Defendant PMS's computer system informed Plaintiff that the MAPICS version 2 software still was not adequate to meet the company's needs. Plaintiff assured Defendant PMS's computer users, however, that the newly available MAPICS version 4 ("MOD 4") would address the company's computer needs. Defendant PMS scheduled to complete the implementation of MOD 4 by March 1, 1994.

Plaintiff experienced numerous difficulties in implementing MOD 4. Among other things, the Administrative Manager of Defendant PMS's Chicago Division, Bohdan Pihanuik, wrote to Plaintiff noting (a) that the division had received inadequate information concerning the new data fields in MOD 4 and (b) that there had been a number of data processing problems. Also, users of Defendant PMS's computer system did not receive adequate information regarding differences in MAPICS version 2 and MOD 4 and thus did not know how to employ properly the new software.

In early March 1994, Plaintiff met with Timm Scott, Plaintiff's direct supervisor and a Vice President of Defendant PMS, and Joseph Bauer, Defendant PMS's President. Other members of Defendant PMS's management also attended the meeting. At the meeting, Plaintiff informed Bauer that Plaintiff would not be able to meet the March 1, 1994 deadline to implement MOD 4 and that he would not be ready to implement until June 1, 1994. Bauer informed Plaintiff that the June 1, 1994 target date was unacceptable and instructed Plaintiff to implement the upgrade by May 1, 1994.

The eventual implementation of MOD 4 caused several problems. Plaintiff admits that May and June 1994 were extremely difficult periods because of the implementation of MOD 4 and the number of bugs and data processing problems that occurred following the implementation. In May and June, Defendant PMS's employees, including Bohdan and Penny Grigg, Administrative

Manager of Defendant PMS's North Carolina Division, complained of numerous serious problems with the MOD 4 and the MIS department itself. Bohdan noted thirteen specific problems with the MOD 4 and Grigg noted problems with the MOD 4 and the fact that no member of Plaintiff's staff had communicated to Grigg or members of her staff about the problems Grigg's staff experienced with the MOD 4.

### B. *Defendant PMS Had Additional Problems With Plaintiff's Performance*

The problems implementing the MOD 4 were not the only problems Defendant PMS experienced with Plaintiff. In his deposition, Plaintiff testifies that during his tenure, the growth of the processing/storage capacity of Defendant PMS's computer system did not keep pace with Defendant PMS's business growth. Plaintiff also testifies that, at times, others criticized his work and that there was a perception at Defendant PMS that some of the operating divisions did not trust Plaintiff's department. Additionally, Plaintiff testifies that a number of the operating divisions believed that there was poor communication between Plaintiff's department and these operating divisions.

These problems were exemplified by the difficulties Bill Schwori, Defendant PMS's Materials Manager, had with Plaintiff and the MIS department. Schwori was a major user of the MIS department's services and had extensive interactions with Plaintiff. Among the problems Schwori encountered were (1) Plaintiff's failing to develop a program in a timely fashion to provide a report and raw data on material costs; (2) Plaintiff's failing to implement timely modifications to Defendant PMS's accounts payable system; and (3) Plaintiff's failing to provide Schwori with necessary information to process vendor invoices, thereby causing an estimated 1,800 invoices not to be processed. Based on these and other problems, Schwori felt that Plaintiff was not the right person for the position of Manager of MIS. Schwori and a number of other PMS managers and executives explained to Bauer and Scott the difficulties these managers were having with Plaintiff's department.

After perceiving the problems a number of Defendant PMS's managers were having with Plaintiff's department, and the fact that Plaintiff did not meet a number of goals that Plaintiff and Scott had established, Bauer retained Anderson Consulting to evaluate Defendant PMS's existing computer system and the MIS department. Among other things, Bauer sought advice on how Defendant PMS could maintain its AS/400 system until such a time as the company could effectuate its decision to implement a Personal Computer ("PC") based computer system with SAP software.

At the conclusion of its study, Anderson issued a report which stated, in part, that Defendant PMS's computer department was not run efficiently or effectively. Among the problems Anderson's report included were (1) that the size of the MIS staff was excessive; (2) that there was little control in place for testing, computer resource management, and training; (3) that there was a lack of trust and poor communication between MIS and Defendant PMS's other divisions; (4) that there were poor day to day operations, procedures, and standards; and (5) that testing and training on MAPICS and related systems were poor to nonexistent.

### C. Defendant Decides To Switch To A PC-based Computer System And Terminates Plaintiff

#### 1. Defendant PMS Decides to Switch to a New Computer System

In late 1993 and 1994, Defendant PMS's parent company, Defendant Hanna, decided that a new corporate-wide global information system was required to meet the company's needs. Defendant Hanna's decision was to be implemented in all of Defendant Hanna's divisions, including Defendant PMS. One of Defendant PMS's sister divisions, Colonial Rubber, tested a PC-based network operating a software package known as SAP. After Colonial's success with the conversion, Defendant PMS's management similarly evaluated the change to a PC-based network with SAP software. The system will replace Defendant PMS's AS/400 minicomputer operating the MAPICS software.

Plaintiff knew that this change was anticipated because Plaintiff discussed the change with Scott. At the time of his termination, Plaintiff had minimal experience with PC-based computer systems and SAP software and with local or wide area networks. Also, Plaintiff admits in his deposition that he would not be able to manage a PC-based system operating SAP software without extensive training.

#### 2. Defendant PMS Terminates Plaintiff

As Bauer became aware of the increasing dissatisfaction with Plaintiff's performance and the MIS department's problems, Bauer concluded that Plaintiff should be terminated. Bauer based his conclusion principally on Plaintiff's performance problems. Contemporaneously, Scott concluded that Plaintiff should be terminated. While there is some conflict about how Scott arrived at this conclusion, Defendants contend that based on Plaintiff's past performance problems, Scott concluded that Plaintiff was not the right person to lead Defendant PMS's transition to a new computer system, especially given the difficulties surrounding the MOD 4 implementation. Plaintiff contends that Scott told Plaintiff prior to his termination that everybody in the MIS department, including Plaintiff, was doing a great job and that Scott intended to train Plaintiff to lead the transition to the new computer system.

In any event, Scott approached Bauer and Ed York, Defendant PMS's Director of Human Resources, and recommended that Plaintiff be terminated. Bauer and York discussed the decision with Scott and, ultimately, Bauer approved the decision. On August 19, 1994, Scott met with Plaintiff and informed Plaintiff about the termination decision. At no time did Plaintiff ever tell Bauer, Scott, or York that Plaintiff felt that he was being discriminated against based on his age. Additionally, at no point during his employment did Bauer, Scott, York, or anyone else say anything to Plaintiff that led Plaintiff to believe that he was being discriminated against based on his age. Plaintiff was 53 at the time of his termination.

### 3. *Defendant PMS Hires David Boeschenstein As Manager of Information Technology*

On December 5, 1994, Defendant PMS hired David Boeschenstein as its Manager of Information Technology. At the time of Plaintiff's termination, neither Bauer nor anyone else had any discussions concerning Boeschenstein's employment with Defendant PMS. Bauer's first contact with Boeschenstein came in the Fall of 1994 when Boeschenstein was interviewed by various personnel at Defendant PMS. Scott made the decision to hire Boeschenstein with Bauer's approval, which was based in part on Boeschenstein's experience in systems implementation, including a SAP implementation. Plaintiff stresses that Boeschenstein had only limited experience with SAP software, as Boeschenstein was involved in only one SAP installation, which was implemented improperly. Boeschenstein was 32 when he was hired.

Boeschenstein's duties as Manager of Information Technology are significantly different that Plaintiff's responsibilities when Plaintiff was Manager of MIS. Boeschenstein's job is to implement the SAP system, whereas Plaintiff's job was to maintain the AS/400. Thus, for example, Plaintiff spent 100% of his time monitoring programming for the AS/400 minicomputer while Boeschenstein spends approximately 10–20% of his time performing comparable duties.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) defines the standard for summary judgment as follows: courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The general rule of summary judgment in the Eleventh Circuit states that the moving party must show the court that no genuine issue of material fact should be decided at trial. *Hayes v. City of Miami*, 52 F.3d 918, 920 (11th Cir.1995); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–09 (11th Cir.1991). Unless the movant for summary judgment meets its burden under Federal Rule of Civil Procedure 56, the obligation of the opposing party does not arise even if no opposing evidentiary material is presented by the party opposing the motion. *Clark,* 929 F.2d at 607–08.

While all evidence and factual inferences are to be viewed in a light most favorable to the nonmoving party, *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1987); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. at 2511; *see also Hayes,* 52 F.3d at 920 ("[A] genuine issue of material fact does not exist unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict in its favor."). Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248, 106 S.Ct. at 2510.

Where neither party can prove either the affirmative or the negative of an essential element of a claim, the movant meets its burden on summary judgment by showing that the opposing party will not be able to meet its burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In *Celotex,* the Supreme Court interpreted Federal Rule of Civil Procedure 56(c) to require the moving party to demonstrate that the nonmoving party lacks evidence to support an essential element of its claim. Thus, the movant's burden is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*

## III. DISCUSSION

### A. *McDonnell Douglas Shifting Burden Analysis Applies In ADEA Cases*

For cases arising under the ADEA, the Eleventh Circuit has adopted a variation of

the shifting burden analysis articulated by the Supreme Court for Title VII claims in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Jameson v. Arrow Co.,* 75 F.3d 1528, 1531 (11th Cir.1996); *Mitchell v. Worldwide Underwriters Ins. Co.,* 967 F.2d 565, 566 (11th Cir.1992). Under this analysis, Plaintiff first must establish a *prima facie* case of discrimination, thereby creating a rebuttable presumption that Defendants unlawfully discriminated against Plaintiff. *Combs v. Plantation Patterns, Inc.,* 106 F.3d 1519, 1528 (11th Cir.1997) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)).

If Plaintiff meets this burden, the burden then shifts to Defendants to produce legitimate non-discriminatory reasons supporting their adverse employment decision. *Combs,* 106 F.3d at 1528; *see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. Defendants' burden is one of production, not persuasion. *See Combs,* 106 F.3d at 1528 (citing *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95). Defendants must only produce evidence of reasons which if believed would support a finding that unlawful discrimination was not the cause of Defendants' employment actions. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Combs,* 106 F.3d at 1528. If Defendants produce evidence of legitimate non-discriminatory reasons, the rebuttable presumption of discrimination created by Plaintiff's *prima facie* case disappears and drops from the case. *Hicks,* 509 U.S. at 507–08, 113 S.Ct. at 2747–48; *Combs,* 106 F.3d at 1528. It is important to note that although the *McDonnell Douglas* presumption shifts the burden of production to Defendants, "the ultimate burden of persuading the trier of fact that [Defendants] intentionally discriminated against [Plaintiff] remains at all times with [Plaintiff]." *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94).

Once Defendants meet their burden of production, the burden then shifts back to Plaintiff to show the ultimate fact of discrimination. *Hicks,* 509 U.S. at 508, 113 S.Ct. at 2747–48; *Combs,* 106 F.3d at 1528. Plaintiff can do this directly by showing that it is more likely than not that Defendants were motivated by discriminatory intent, or indirectly by showing that Defendants' legitimate nondiscriminatory reasons are unworthy of credence. *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749–50; *Combs,* 106 F.3d at 1528. Evidence of either permits an inference of discrimination and requires submitting the case to the trier of fact. *Id.* at 1529; *Richardson v. Leeds Police Dep't,* 71 F.3d 801, 806 (11th Cir.1995); *Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir.1994); *Howard v. BP Oil Co.,* 32 F.3d 520, 527 (11th Cir.1994); *Batey v. Stone,* 24 F.3d 1330, 1334 (11th Cir.1994); *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 921 (11th Cir.1993); *but see Isenbergh v. Knight–Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 443 (11th Cir. 1996) (questioning whether *Howard* decision, and necessarily *Batey* and *Hairston* decisions, represent a correct statement of the law); *Walker v. NationsBank of Florida,* 53 F.3d 1548, 1556–58 (11th Cir.1995) (affirming district court's granting of judgment as a matter of law despite the fact that the plaintiff established a *prima facie* case and put on evidence sufficient to permit the factfinder to disbelieve all of the employer's proffered non-discriminatory reasons).

## B. *Plaintiff's Prima Facie Case Of Discrimination*

To establish a *prima facie* case of discrimination, Plaintiff must show that he (1) was a member of the protected group of persons within the ages of 40 and 70, (2) was subject to an adverse employment action, (3) was replaced with a person substantially younger than Plaintiff, and (4) was qualified to do the job. *See O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 878, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996); *Jameson,* 75 F.3d at 1531.[1] Plaintiff was 53 when

---

1. In *Jameson,* as well as previous cases, the Eleventh Circuit's third element for establishing a *prima facie* of discrimination under the ADEA

was that the plaintiff must show that he was replaced by someone outside the protected class. However, in *O'Connor,* the Supreme Court held

Defendant terminated his employment and thus satisfies the first two elements. Also, the employee who purportedly "replaced" Plaintiff was 32 and significantly younger than Plaintiff.

Defendant contends, however, that Plaintiff was not "replaced," because Boeschenstein's position is significantly different from Plaintiff's old position. Further, Defendant contends that Plaintiff is not qualified for this new position.

### 1. Plaintiff Must Show That He Was Replaced By Boeschenstein

■ As an initial matter, Plaintiff contends that he is not required to show that he was replaced by Boeschenstein. Plaintiff relies on the many cases that hold that a plaintiff can create a rebuttable presumption of discrimination without meeting all of *McDonnell Douglas's* four elements of a *prima facie* case of discrimination. *See, e.g., Maddow v. Procter & Gamble Co., Inc.,* 107 F.3d 846, 851 (11th Cir.1997) ("We generally ... eschew[ ] and overly strict formulation of the elements of a prima facie case, particularly in age discrimination cases." (internal quotes omitted)); *Jameson,* 75 F.3d at 1531; *Alphin v. Sears Roebuck & Co.,* 940 F.2d 1497, 1500 (11th Cir.1991). These cases hold that the critical inquiry is whether "an ordinary person could reasonably infer discrimination if the facts remain unrebutted." *Id.*

Outside of the above stated elements of a *prima facie* case, Plaintiff fails to present evidence of any additional facts from which a reasonable fact-finder could infer discrimination. In his deposition, Plaintiff admits that no one ever said anything to him about his age and that Plaintiff never told Bauer or Scott that Plaintiff felt he was being discriminated against based on his age. Finally, Plaintiff admits that he was not suspicious that age played a factor in his termination until (a) he discovered he was "replaced" by

the younger Boeschenstein and (b) he was notified in December 1994 that Defendant PMS's switch to the PC-based network had not yet occurred and was not anticipated to occur in the near future.

The only fact Plaintiff presents (outside of any *prima facie* elements) that even plausibly shows discrimination is the fact that five managers (including Plaintiff, and later, Scott) over the age of 40 were terminated or left Defendant's employ after Bauer became President of Defendant PMS. However, Plaintiff fails to present any evidence that only managers over 40 were terminated and fails to present any evidence that the managers over 40 that were terminated were replaced by younger managers. This evidence is not sufficient to create a rebuttable presumption that age discrimination played a factor in Plaintiff's termination. Thus, Plaintiff here cannot create a rebuttable presumption of discrimination absent satisfying each of the four elements of *McDonnell Douglas's prima face* case of discrimination. A *fortiori,* Plaintiff must show that he was replaced by Boeschenstein.

### 2. Plaintiff Was Not "Replaced" By Boeschenstein

■ While it is beyond serious dispute that some of Boeschenstein's duties as Manager of Information Technology (overseeing a PC-based network with SAP software) parallel some of Plaintiff's duties as Manager of Information Systems (overseeing a minicomputer or mainframe based network with MAPICS software), it is also beyond dispute that the nature of Plaintiff's and Boeschenstein's duties are different. Plaintiff's duties almost exclusively centered around monitoring, programming, and maintaining the AS/400 and its MAPICS software. On the other hand, only 20% of Boeschenstein's duties involve maintaining the AS/400.

that "there [was not] a logical connection between [such a showing] and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.'" *O'Connor,* 517 U.S. at ——, 116 S.Ct. at 1310 (quoting *Burdine,* 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7). The Supreme Court stated that "the fact that a replacement is substantially younger than the

plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *Id.; see also Corbin v. Southland Int'l Trucks,* 25 F.3d 1545, 1549 (11th Cir.1994); *Baker v. Sears, Roebuck & Co.,* 903 F.2d 1515, 1520 (11th Cir.1990).

Defendants admit that Boeschenstein is responsible for keeping the AS/400 operational while Defendants implement their new PC-based network. However, Boeschenstein's position centers principally on duties for which Plaintiff bore no responsibility. A comparison of Plaintiff's and Boeschenstein's job descriptions shows that, among other things, Boeschenstein is responsible for (1) designing, implementing, and managing Defendant PMS's conversion to SAP software; (2) serving as project leader for the SAP/re-engineering initiative; (3) developing and managing the appropriate center of excellence to support Defendant PMS's conversion and ongoing efforts; and (4) developing, installing, coordinating, and administering local area networks in all Defendant PMS's units and tieing them together with a wide area network that is linked with Defendant PMS's solution center in Cincinnati. Plaintiff's position did not involve any of the above job responsibilities.

Plaintiff argues that Defendants admit that Boeschenstein replaced Plaintiff and argues that Plaintiff's and Boeschenstein's positions are substantially similar. Plaintiff's first argument refers to a statement made by Scott in an affidavit submitted to the EEOC wherein Scott states that Defendant PMS "did hire a replacement for Mr. Wisdom, a Mr. David Boeschenstein." Scott EEOC Aff., Pl. Exh. D. However, Scott's lay statement that Defendant PMS hired a replacement does not alter the fact that Plaintiff's and Boeschenstein's duties and responsibilities were significantly different. In light of the undisputed evidence regarding Plaintiff's and Boeschenstein's respective duties, Scott's statement, if anything, can only mean that the Manager of Information Technology Position, created for the purposes of implementing Defendant PMS's new computer system, replaced the obsolete Manager of MIS position, which was responsible for maintaining a computer system that Defendant PMS decided to discard. It is undisputed that Boeschenstein filled the position that replaced Plaintiff's old position.

Plaintiff's second argument that the two positions are substantially similar is not supported by any evidence and, in fact, is refuted by Defendants' evidence. Plaintiff contends that Boeschenstein's position boils down to simply the same duties, only different hardware. Even if Plaintiff presented any evidence supporting this conclusory statement, which he does not, Plaintiff ignores the inescapable fact that Boeschenstein's position involves implementing the transition to the new system, as well as maintaining it once it is implemented, and that Boeschenstein (and not Plaintiff) has experience with the type of computer system Defendants are implementing.

In sum, Plaintiff fails to present evidence sufficient to create a jury question that Plaintiff was replaced by Boeschenstein because the undisputed evidence shows that Boeschenstein's position is different from Plaintiff's old position. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 982 (11th Cir.1989) (finding that duties and responsibilities are relevant to determining whether a plaintiff has been replaced); *Jones v. Western Geophysical Co. of Am.*, 669 F.2d 280, 283–84 (5th Cir.1982) (plaintiff not replaced where alleged replacement's job duties were completely different); *McGovern v. Transamerica Ins. Fin. Co.*, 854 F.Supp. 393, 398 (D.Md.1993) (same), *aff'd*, 27 F.3d 563 (4th Cir.1994); *Daniels v. Westinghouse Elec. Corp.*, 772 F.Supp. 1278, 1281 (N.D.Ga.1990) (holding that plaintiff was not replaced where plaintiff's position was eliminated), *aff'd*, 944 F.2d 828 (11th Cir.1991); *but see Rollins v. TechSouth*, 833 F.2d 1525, 1529 (11th Cir. 1987) (holding that plaintiff presented sufficient evidence to submit replacement issue to fact-finder).[2]

**2.** In *Rollins,* the defendant argued that the plaintiff's position was eliminated and that what remained of the plaintiff's duties comprised only a small portion of the plaintiff's alleged replacement's duties. However, the Eleventh Circuit noted that the plaintiff trained her alleged replacement for the replacement's position and that plaintiff presented evidence that she was qualified to perform all the duties of her replacement. Under these facts the Eleventh Circuit found that the district court improperly granted summary judgment on the replacement issue. 833 F.2d at 1529. However, the instant case is distinguishable because Plaintiff is not qualified to perform Boeschenstein's duties, as discussed *infra*. Also, the only duties of Plaintiff that Boes-

### 3. Plaintiff Is Not Qualified To Occupy Boeschenstein's Position

■ Even assuming *arguendo* Plaintiff was replaced by Boeschenstein, Plaintiff fails to present sufficient evidence to create a jury question whether Plaintiff is qualified to occupy Boeschenstein's position. The job description for Boeschenstein's position shows that the position requires, among other things, (a) open architecture and PC experience, (b) reengineering experience and ability to act as change agent, and (c) exposure to SAP software and conversions/implementation. Boeschenstein meets all of these qualifications while Plaintiff does not. This alone shows that Plaintiff is not qualified for Boeschenstein's position.

Plaintiff submits that he is at least as qualified as Boeschenstein. First, Plaintiff relies on his years of experience as Defendant PMS's Manager of MIS. This, however, ignores that Boeschenstein's position is fundamentally different from Plaintiff's old position. *See Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1386 n. 7 (11th Cir.1983). Plaintiff next emphasizes that Boeschenstein had limited SAP experience when he was hired because Boeschenstein was involved in only one SAP implementation, which was done improperly. However, it is undisputed that Boeschenstein did have experience implementing SAP. Further, the fact that the implementation was improper was not attributed to Boeschenstein's lack of ability to implement SAP, but rather to the easy to learn from fact that the implementation was done prior to re-engineering rather than in conjunction with it. Moreover, it is undisputed that Boeschenstein had experience with PC–based systems using local and wide area networks.[3]

Finally, Plaintiff submits that Scott told Plaintiff that Plaintiff would be trained so that Plaintiff could oversee the implementation of the PC-based system and the SAP software and that Scott's statement constitutes an admission that Plaintiff is qualified to assume Boeschenstein's responsibilities. However, the statement shows just the opposite. The fact that Plaintiff had no experience in PC-based systems and needed to be trained evidences Plaintiff's lack of qualifications. Plaintiff even admits in his deposition that his assuming Boeschenstein's duties would require "extensive training."

For all of the foregoing reasons, the Court finds that Plaintiff fails to present sufficient evidence to establish a prima *facie case* of age discrimination.

### C. Defendants' Legitimate Non–Discriminatory Reasons

Assuming *arguendo* Plaintiff established a *prima facie* case of discrimination, Defendants produce evidence of two legitimate non-discriminatory reasons why Defendants terminated Plaintiff's employment. First, Defendant PMS's management believed that Plaintiff lacked the technical, managerial, and leadership skills necessary to lead the Defendants' change from the AS400 minicomputer system to a PC-based network operating SAP software. Second, Defendants present evidence that Defendants were not pleased with Plaintiff's performance operating the AS400 mini-computer system, including Plaintiff's failure to implement properly the MOD 4 program.

### D. Plaintiff's Evidence Of Pretext

■ Evidence of pretext typically takes one of three forms. Plaintiff can attempt to show (1) that Defendants' reasons have no basis in fact, (2) that the proffered reasons did not actually motivate Plaintiff's termination, or (3) that the proffered reasons were insufficient to motivate the employment decision. *See Walker v. NationsBank of Florida*, 53 F.3d 1548, 1564 (11th Cir.1995) (Johnson, J., specially concurring); *Manzer*

---

chenstein retains—namely, maintaining the AS/400—are being phased out in the implementation of Defendants' new PC-based system and ultimately will be eliminated.

**3.** Plaintiff also argues that Defendants still are using the AS/400 computer system and that he, at a minimum, is qualified to maintain that system. However, even assuming *arguendo* this is true, it is undisputed that Defendants made the decision to discard the AS/400. The fact that parts of the AS/400 system still are operational does not change the fact that Defendants are phasing the AS/400 out of operation and that it eventually will be out of use altogether.

*v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994); *McNabola v. Chicago Transit Auth.,* 10 F.3d 501, 513 (7th Cir.1993). Plaintiff's pretext arguments fall in the first two categories.

■ Plaintiff first argues that Defendants' legitimate non-discriminatory reasons for terminating him have no basis in fact. Defendants present compelling evidence to the contrary. The evidence shows overwhelmingly that there were numerous actual and perceived problems with Plaintiff and his staff in the MIS department. The undisputed evidence also shows that Plaintiff has no experience with "open architecture" PC-based systems or SAP implementation and thus did not have the required skills to lead Defendant PMS's transition to its new computer system. The Court rejects Plaintiff's argument that there was no factual basis for Defendants' proffered reasons.

■ This leads us to Plaintiff's second argument—that Defendants have submitted shifting, contradictory, and inconsistent reasons for terminating Plaintiff. Plaintiff argues that the fact that Defendants' reasons allegedly have shifted constantly shows that the reasons Defendants have proffered are not the "real" reasons Defendants terminated Plaintiff. *See Howard v. BP Oil Co.,* 32 F.3d 520, 526 (11th Cir.1994).[4]

Plaintiff's evidence of allegedly inconsistent statements in the instant case is comprised of the following: (1) Plaintiff testifies that at the time of his termination, Scott informed him that the basis for his termination was poor performance, especially the difficulties with the MOD 4 implementation; (2) in a separation notice submitted to the Georgia Department of Labor and later in an affidavit submitted to the EEOC, Scott stated that Plaintiff's performance was not the specific reason Plaintiff was terminated, but rather that Defendant PMS decided to take its computer division in a new direction and Plaintiff did not possess the required skill set; and (3) in his deposition, Bauer testified that Plaintiff's performance, and not Defendant PMS's decision to take its computer division in a different direction, was the major issue resulting in Plaintiff's termination.

The Court finds that Plaintiff's evidence is not sufficient to create a jury issue regarding pretext. As an initial matter, the above statements are not inherently inconsistent. Scott recommended to Bauer that Plaintiff be terminated and the basis for Scott's recommendation was that Scott did not believe that Plaintiff was the person to lead Defendant PMS's transition to a PC based computer system. Bauer approved Plaintiff's termination based on Bauer's awareness of Plaintiff's performance problems. Both reasons are supported by strong factual bases and the reasons are not mutually exclusive. Indeed, while Scott stated in his EEOC affidavit that Plaintiff's performance problems were not the specific reasons he recommended that Plaintiff be terminated, Scott's affidavit recounted the numerous performance problems Defendant PMS encountered with Plaintiff. The fact that Scott and Bauer weighed differently the factors supporting the decision to terminate Plaintiff

---

4. In *Howard,* the Eleventh Circuit held that a defendant's inconsistent statements could be sufficient to show pretext. 32 F.3d at 526. In *Howard,* the plaintiff alleged that the defendant discriminated against him based on his race when it did not award the plaintiff a gas station in certain geographic regions that the plaintiff preferred while awarding stations in those regions to members of other races. *Id.* The defendant in *Howard* stated that it had no written criteria for the selection of dealers but that it merely sought individuals with managerial, business and interpersonal skills and preferred people with experience in the petroleum industry. *Id.* The plaintiff met these requirements, while some of the individuals awarded stations in the plaintiff's preferred geographic reasons did not. *Id.*

In attempting to explain this discrepancy, the defendant presented evidence that its assignment of stations in the plaintiff's preferred geographic region was based on the facts that those individuals were family members of existing dealers. The Eleventh Circuit noted that this reason not only was inconsistent the defendant's selection criteria stated above, but also was contradicted by the testimony of the defendant's district manager, who testified that he was not aware of any policy favoring family members. *Id.* at 527. The Eleventh Circuit found that the defendant's contradictory and inconsistent statements would enable a jury to find that the defendant had no policy favoring family members and thus were sufficient to show pretext. *Id.*

does not render Defendant's reasons contradictory or inconsistent. Moreover, Plaintiff's argument that Scott and Bauer relied on different reasons, each of which were sufficient to support Plaintiff's termination, does not undermine Defendant's overall nondiscriminatory rationale for terminating Plaintiff. *See Brown v. American Honda Motor Co. Inc.*, 939 F.2d 946, 954 (11th Cir.1991) ("[A]lthough the plaintiff has produced scattered pieces of circumstantial evidence, none of it, even taken as a whole, raises sufficient questions to undermine [the defendant's] nondiscriminatory rationale.").

This brings us to the one statement by Scott that, if made, is inconsistent with other statements by Scott concerning the reasons for Plaintiff's termination. In his deposition, Plaintiff testifies that on August 4, 1994, Scott told Plaintiff that Plaintiff and his staff were doing a great job. One might argue that it is incredible that Scott would make such a statement in light of the undisputed evidence of the performance problems Defendant PMS encountered with Plaintiff. However, at the summary judgment stage, the Court is precluded from making credibility determinations, but rather must determine whether if Plaintiff's evidence is believed, it is sufficient to create a jury issue. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir.1993).

Even assuming Scott made this statement on August 4, 1994, Plaintiff's evidence still is not sufficient to create a jury question on the issue of pretext. At most, Plaintiff's evidence undermines Scott's rationale for recommending Plaintiff's termination. This evidence is not sufficient to undermine Bauer's independent and equally sufficient non-discriminatory reason for approving Plaintiff's termination—Bauer's reasonable and factually supported belief concerning Plaintiff's performance problems—especially in light of the overwhelming evidence concerning Plaintiff's performance problems.

For all of the foregoing reasons, the Court **GRANTS** Defendants' Motions for Summary Judgment on Plaintiff's claim under the ADEA.[5]

### E. *Plaintiff's Age Discrimination Claim Under State Law*

█ Plaintiff also brings a claim of age discrimination under state law. Specifically, Plaintiff contends that O.C.G.A. § 34–1–2 (which criminalizes age discrimination in employment) and the ADEA create legal duties enforceable under O.C.G.A. § 51–1–8, which states:

> [P]rivate duties may arise from statute or from relations created by contract, express or implied. The violation of a private duty, accompanied by damage, shall give a right of action. O.C.G.A. § 51–1–8. Regarding the ADEA, this Court already has found that Plaintiff fails to present sufficient evidence of any violation of the ADEA. Thus, any violation of the ADEA cannot serve as a basis for Plaintiff's claim under section 51–1–8.

The Court further finds that Plaintiff's claim brought collectively under O.C.G.A. §§ 34–1–2 and 51–1–8 also fails as a matter of law. In *Calhoun v. Federal Nat. Mortg. Ass'n*, 823 F.2d 451 (11th Cir.1987), the Eleventh Circuit held that O.C.G.A. § 34–1–2 does not give rise to a private cause of action. *Id.; see also Suber v. Bulloch Bd. of Educ.*, 722 F.Supp. 736, 743 (S.D.Ga.1989). Further, another judge of this Court has held that O.C.G.A. § 34–1–2, even when read together with O.C.G.A. § 51–1–8, does not afford a private right of action under this penal statute. *Bruce v. S & H Riggers & Erectors, Inc.*, 732 F.Supp. 1172, 1180 (N.D.Ga.1990). This Court agrees with the *Bruce* decision and finds that Plaintiff's claim brought collectively under O.C.G.A. §§ 34–1–2 and 51–1–8 fails as a matter of law.

Alternatively, the Court finds that Plaintiff fails to present sufficient evidence to sustain a claim of age discrimination under state law.

---

5. Because the Court is granting Defendants' Motions for Summary Judgment on other grounds, the Court does not address Defendant Hanna's argument that Defendant Hanna was never Plaintiff's employer.

For the foregoing reasons, the Court **GRANTS** Defendants' Motions for Summary Judgment on Plaintiff's age discrimination claim under state law.

F. *Plaintiff's Claim Of Intentional Infliction Of Emotional Distress*

Plaintiff concedes that his claim for intentional infliction of emotional distress is without merit. Therefore, the Court **GRANTS** Defendants' Motions for Summary Judgment on Plaintiff's claim for intentional infliction of emotional distress.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motions for Summary Judgment [21–1; 22–1] on all of Plaintiff's claims. The Court **GRANTS** Plaintiff's Request for Leave to File Supplemental Authority [35–1].

The Court directs the Clerk to enter final judgment in favor of Defendants on all of Plaintiff's claims.